[S. F. No. 23559. July 19, 1977.]

In re the Marriage of HEIDRUN H. and GARY B. SKADEN.
GARY B. SKADEN, Respondent, v.
HEIDRUN H. SKADEN, Appellant.

COUNSEL

Thomas C. Westley for Appellant.

Saulque & Viets and Richard L. Viets for Respondent.

OPINION

SULLIVAN, J.*—In *In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561], this court, overruling a long line of prior decisions originating in *French v. French* (1941) 17 Cal.2d 775 [112 P.2d 235, 134 A.L.R. 366], held that a spouse's retirement pension rights, whether or not vested, represent a property interest, and that to the extent such rights derive from employment during coverture, they comprise a community asset subject to division in a dissolution proceeding. In the instant case we confront the related question whether vested "termination benefits" contained in an insurance sales agent's agreement with an insurer also represent such a divisible property interest. We conclude that they do. To implement their division under the particular circumstances of the instant case, we deem it necessary and appropriate to indicate certain guidelines and procedures. We reverse the judgment and remand the cause for further proceedings.

Heidrun and Gary Skaden were married in 1961 and separated in 1973. Starting in 1965 Gary was an insurance sales agent of State Farm Insurance Companies (State Farm) working under the provisions of a contract entitled "State Farm Agent's Agreement," which was executed at the commencement of the agency relationship. The agreement

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

provided inter alia that if it were terminated two years or more after its effective date, whether by death of the agent or by written notice of either party, the agent was to receive certain "termination benefits."[1] These benefits consisted in general of specified percentages of net premiums, collected within a five-year period after termination, on policies that were credited to the agent's account on the date of termination.[2] Payments were to be made on an installment basis,

---

[1]We adopt this term from the judgment and the trial court's findings of fact and conclusions of law.

An agent may also receive termination benefits on those automobile policies which he releases to the company for reassignment under "conditions of ill health, advancing years, or other conditions which might make desirable the reduction of [his] servicing responsibilities without . . . complete termination . . . ."

[2]Section IV, paragraph 1, of the agreement provides:

"1. In the event this Agreement is terminated two years or more after its effective date the respective Companies will, subject to the conditions set forth in paragraphs 2 and 3 below, pay you or your legal representative, less any deductions for commission charge backs, as follows:

"A. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay, under the terms of the applicable Schedule of Payments attached hereto, on the policies designated below which are credited to your account by the Company as of the date of termination, a termination payment in an amount equal to:

"(1) Ten percent of the net premium collections received and recorded each month by the Company during the first twelve months following the date of termination on all such 'primary' automobile, recreational vehicle and personal liability policies which remain in the same state or province, and

"(2) Seven percent of the second and subsequent policy years net premium collections received and recorded each month by the Company during the first twelve months following the date of termination, on all such health insurance policies which remain in the same state or province, except those policies which become available in the same state for assignment to an agent as a result of the termination of an agreement between the Company and an agent on which one year has not elapsed since the date of that termination.

"B. STATE FARM FIRE AND CASUALTY COMPANY AND STATE FARM GENERAL INSURANCE COMPANY each will pay a termination payment in an amount equal to the amount of commission percentage set forth in the applicable Schedule of Payments attached hereto on renewal net premium collections received and recorded each month by the Company during the first twelve months following the date of termination, on policies credited to your account by the Company as of the date of termination which remains in the same state or province, except those policies which became available in the same state for assignment to an agent as a result of the termination of an agreement between the Company and an agent on which one year has not elapsed since the date of that termination.

"C. STATE FARM LIFE INSURANCE COMPANY will pay a termination payment in an amount equal to the same compensation for second and subsequent policy years as would have been due and payable to you for the first five years following the date of termination on all State Farm Life policies personally written by you or assigned to you by the Company for compensation, under the terms of the applicable Schedule of Payments attached hereto, if this Agreement had not been terminated."

extending over a five-year period,[3] and were to be subject to specified conditions relating to competitive activities on the part of the terminated agent.[4]

[3]Section IV, paragraph 2, of the agreement provides:

"2. Subject to the conditions set forth in paragraph 3 below, the amounts provided in paragraph 1 above will be paid as follows:

"A. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay monthly instalments,

"(1) On 'primary' automobile, recreational vehicle and personal liability policies.

"(a) For each of the first twelve months following the date of termination, in an amount equal to one-fifth of ten percent of the net premium collections received and recorded in that month by the Company, and,

"(b) In each of the succeeding forty-eight months, in the amount of one-twelfth of the total of all monthly instalments paid by the Company for the first twelve month period following the date of termination.

"(2) On health insurance policies.

"(a) For each of the first twelve months following the date of termination in an amount equal to one-half of seven percent of the second and subsequent policy years net premium collections received and recorded in that month by the Company.

"(b) In each of the succeeding twelve months, in the amount of one-twelfth of the total of all monthly instalments paid by the Company for the first twelve month period following the date of termination.

"B. STATE FARM FIRE AND CASUALTY COMPANY AND STATE FARM GENERAL INSURANCE COMPANY will pay monthly instalments.

"(1) For each of the first twelve months following the date of termination, in an amount equal to one-half of the amount of commission percentage set forth in the applicable Schedule of Payments attached hereto on renewal and instalment net premium collections received and recorded in that month by the Company.

"(2) In each of the succeeding twelve months, in the amount of one-twelfth of the total of all monthly instalments paid by the Company for the first twelve month period following the date of termination.

"C. STATE FARM LIFE INSURANCE COMPANY will pay monthly instalments for each of the sixty months following the date of termination, in the amount of such compensation as would have been due and payable to you for that month if this Agreement had not been terminated."

[4]Section IV, paragraph 3, of the agreement provides:

"3. Payments under paragraphs 1 and 2 above shall be as follows:

"A. If, within ten days following the date of termination, all property belonging to the respective Companies has been returned or made available for return to that Company or its authorized representative, you shall qualify for the first two monthly instalments from that Company as provided in paragraphs 1 and 2.

"B. If you qualified for payments by the respective Companies under subparagraph 3A, and so long as you have not, either personally or through any other person, agency, or organization, solicited or sold, either at renewal time or otherwise, to that Company's policyholders which were credited to your account at the time of termination, any insurance coverage competitive with the insurance coverages sold by that Company, you shall qualify for up to ten additional monthly instalments from that Company as provided in paragraphs 1 and 2.

"C. If you have qualified for payments by the respective Companies in all twelve months under subparagraphs 3A and 3B, and if for the period of one year following the date of termination you have not engaged in the insurance business within twenty-five miles of your principal place of business at the date of termination, either personally or through any other person, agency, or organization, as a licensed agent, solicitor, or broker for any kind of insurance written by that Company, you shall qualify for the remaining monthly instalments from that Company as provided in paragraphs 1 and 2."

The trial court found and concluded that the above mentioned termination benefits "are not divisible community property but merely an expectancy and a continuation of [Gary's] earnings, not presently capable of ascertainment or computation and therefore of no value." In the interlocutory judgment of dissolution of marriage, entered on June 23, 1975, the court awarded such benefits to Gary "as his sole and separate property."

■ Heidrun appeals from the judgment, contending that the above termination benefits, like the pension rights involved in *Brown,* represent a form of deferred compensation for services rendered. This compensation, she argues, deriving from the terms of the agent's agreement, constituted a property right subject to division upon or following dissolution to the extent that it was community in character.[5] We agree.

Although we are mindful of the risk of imprecision inherent in any comparison of the descriptions of forms of property claimed to be similar, we nevertheless think it illuminating to examine the rights here in question in the light of the terminology used by us in *Brown.* ■ As we there explained, the use of the term "vested" has acquired a special meaning in the context of divorce and dissolution. A right which is "vested" for these purposes, we stated, is one which "survives the discharge or voluntary termination of the employee." (15 Cal.3d at p. 842.) Such a "vested" right may be either "matured" or "immature." If payment is subject to one or more conditions—e.g., a condition of survival to a specified time—the right is said to be "vested" but "immature." If on the other hand it is subject to no conditions and constitutes an "unconditional right to immediate payment," it is said to be "matured." (*Id.*)

We believe that the right to termination benefits involved in the instant case must be considered "vested" for present purposes. By the terms of the agent's agreement and subject to the conditions there set forth in paragraphs 2 and 3 of section IV (see fns. 3 and 4, *ante*), the right arises two years after the effective date of the agreement—a date

---

[5]Heidrun also urges that she is entitled to a portion of any renewal benefits received by Gary *after* separation during the continued life of the agreement on account of renewal premiums collected on policies sold during the period of coverture. This point was raised for the first time on appeal and no facts were developed relative to it in the trial court. We therefore do not consider it here. (See *Harriman* v. *Tetik* (1961) 56 Cal.2d 805, 810 [17 Cal.Rptr. 134, 366 P.2d 486]; cf. *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) In any event, the issue now appears to have been abandoned.

long past when the dissolution proceedings were commenced. By the same token, however, the right was "immature" at that time: no termination of the agent's agreement had occurred, and the post-termination conditions of payment had not been fulfilled. Thus we are here concerned with a "vested" but "immature" right.

It is clear in the context of retirement pensions that a "vested"[6] but "immature" pension right is property subject to division upon dissolution to the extent of its community character. (*Brown, supra,* 15 Cal.3d at p. 847; *Smith* v. *Lewis* (1975) 13 Cal.3d 349, 355, fn. 4 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231]; *In re Marriage of Fithian* (1974) 10 Cal.3d 592, 596, fn. 2 [111 Cal.Rptr. 369, 517 P.2d 449].) The fundamental question in this case, therefore, is whether the rights here in question differ in character from vested pension rights to an extent which would justify treating them differently.

Pension benefits, we held in *Brown,* "represent a form of deferred compensation for services rendered." (15 Cal.3d at p. 845.) "[T]he employee's right to such benefits is a contractual right, derived from the terms of the employment contract," and as such "is not an expectancy but a chose in action, a form of property." (*Id.*) The benefits involved in the instant case, Heidrun urges, are identical in character, and the right to them, also derived from the terms of the agreement, is likewise not a mere expectancy but a chose in action—and therefore property subject to division upon dissolution. Gary, on the other hand, urges that the benefits here in question are fundamentally different from pension benefits. Rather than being a form of deferred compensation for services rendered, he contends, they represent "consideration for termination," the right to which arises only upon termination. Alternatively he seems to argue that the termination benefits constitute consideration for the agent's forebearance from undertaking certain business pursuits *after* termination as, for example, the competitive activities which are the subject of the conditions set forth in section IV, paragraph 3 of the agreement. (See fn. 4, *ante.*)

We have concluded that Heidrun's position is the correct one. The agreement provides that termination benefits are payable "[i]n the event this Agreement is terminated two years or more after its effective date . . .

---

[6]*Brown,* of course, holds that even *nonvested* pension rights are property subject to division upon dissolution. (15 Cal.3d 838, 847, 848-851.) Because the termination benefits here in question are clearly vested, we are not called upon to determine whether nonvested rights of this character also constitute divisible community property.

subject to the conditions set forth in paragraphs 2 and 3 . . ." (quoted in fns. 3 and 4, *ante*). Nothing in the agreement suggests that such benefits are "consideration for termination." Moreover, termination may occur under the agreement in one of three ways: (1) upon written notice by the agent, (2) upon written notice by the company, or (3) upon the death of the agent. It is difficult to understand how payments made "in the event" of termination may be characterized as "consideration" for such termination when that event may be involuntary as, for example, upon the agent's death or the company's written notice, rather than upon the written notice of the agent.

The suggestion that the benefits here in question should be characterized as consideration for the agent's post-termination compliance with conditions set forth in paragraphs 2 and 3 of the agreement is equally devoid of merit. Again the terms of the agreement, which make payment "subject to" these conditions, nowhere indicate that compliance with them is the "performance" on the part of the agent for which payment is to be made. If this were so, we would expect the amount of payment to depend directly upon the degree of compliance. Under the terms of the agreement, however, the amount of payment relates directly to the number and character of policies credited to the account of the agent at the time of termination, subject to adjustment according to the extent of the agent's compliance with conditions of the agreement.

■ As we pointed out in *Waite* v. *Waite* (1972) 6 Cal.3d 461 [99 Cal.Rptr. 325, 492 P.2d 13], the fact that the payment of benefits, the right to which has vested, is subject to a condition whose fulfillment is wholly within the control of the employee spouse does not affect the vested nature of the right or degrade it into an "expectancy." (6 Cal.3d at p. 472; see also *Brown, supra,* 15 Cal.3d at pp. 844, 846, fn. 8; *In re Marriage of Peterson* (1974) 41 Cal.App.3d 642, 650-651 [115 Cal.Rptr. 184].)

■ We think it clear from the foregoing that the termination benefits contemplated by the subject contract were, like pension benefits, "a form of deferred compensation for services rendered." The right to these benefits "derived from the terms of the employment contract" and under those terms became vested upon the expiration of two years after the date of execution. Manifestly, then, under the cases we have cited (see text accompanying fn. 6, *ante*), that right is property subject to

division, to the extent of its community character, upon dissolution of the marriage.[7] (Civ. Code, § 4800.)

■ It remains for us to consider the proper method for the division of the termination benefits as marital property. In addressing a similar question in *Brown* we indicated two basic solutions of this problem: first, a determination by the trial court of the present value of the rights or benefits adjudged to be marital property and an equal division or adjustment of the same (see *Phillipson* v. *Board of Administration* (1970) 3 Cal.3d 32, 46-47 [89 Cal.Rptr. 61, 473 P.2d 765]; see also *Brown, supra,* 15 Cal.3d at p. 848, fn. 10); and second, "if the court concludes that because of uncertainties affecting the vesting or maturation of [such] rights . . . it should not attempt to divide the present value . . . it can instead award each spouse an appropriate portion of each . . . payment as it is paid." (*Brown, supra,* 15 Cal.3d at p. 848.) The latter solution, which has been used in the division of vested pension rights (*id.,* at p. 849), has the additional advantage of removing from the employee spouse the risk of paying the community for rights which may not mature.[8] (See Note (1973) 24 Hastings L.J. 347, 356.) On the other hand, it has the disadvantage of requiring the court to reserve jurisdiction in order to supervise any future payments and their proper division at a date which may lie far in the future—a procedure which may have unsatisfactory elements of delay for each of the parties.

We believe that in cases of this kind the matter of the proper division of rights to termination benefits as marital property should be left to the sound discretion of the trial court, exercised in light of the particular circumstances of the case. We anticipate that in many instances the

---

[7]As we have indicated above (at fn. 6, *ante*), we here express no opinion as to whether a "nonvested" right to termination benefits (such as would have been involved in the instant case had dissolution occurred less than two years after execution of the agreement) should likewise be considered property subject to division on dissolution.

[8]In the instant case, as we have pointed out, the only way in which the vested termination benefits may fail to mature (in the sense that that term requires an "unconditional right to immediate payment"—see *Brown, supra,* at p. 842) is through the agent's voluntary noncompliance with the post-termination conditions precedent to payment. As we said in a related context in *Brown*: "The employee retains the right to decide, and by his decision define, the nature of the . . . benefits owned by the community." (15 Cal.3d at p. 850.) This situation, however, does not dispose of the problem consequent upon ordering the employee spouse to pay the community for rights which may not mature.

parties, seeking to achieve a final determination at the time of dissolution, may be able to reach some reasonable agreement and settlement relative to the present disposition of the rights in question. In cases where this is not possible the court will of necessity be called upon to make an assessment of the relative feasibility of present valuation by actuarial means (see generally Projector, *Valuation of Retirement Benefits in Marriage Dissolutions* (1975) 50 L.A. Bar Bull. 229) before choosing between that approach and the expedient of reserving jurisdiction so as to determine value and effectuate a disposition of the property at some time in the future. We apprehend that depending on the evidence before it, a myriad of considerations may have a bearing on the trial court's exercise of discretion in resolving the problem. In the instant case, the court, having decided that the termination benefits did not constitute divisible community property, was not called upon to address the questions of present valuation or reservation of jurisdiction for valuation at a future time. Accordingly, we think the cause should be remanded to the trial court for further proceedings consistent with the views expressed in this opinion. A division or evaluation of Gary's interest in the termination benefits may require a readjustment in the division of the community property. (See *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 751 [131 Cal.Rptr. 873, 552 P.2d 1169].)

■ Finally, we conclude that the same rule of retroactive application announced by us in *Brown* should obtain in the area of termination benefits. Accordingly, we further hold that our decision today should not apply retroactively to permit a nonemployee spouse to assert an interest in vested rights to termination benefits when the property rights of the marriage have already been finally adjudicated unless the decree expressly reserved jurisdiction to divide such benefits or the rights thereto at a later date. Our decision will apply, however, to any case in which the property rights arising from the marriage have not been adjudicated, to any case in which such an adjudication is still subject to appellate review, or to any case in which the trial court has expressly reserved jurisdiction to divide termination benefits or the rights thereto. (See *Brown, supra,* 15 Cal.3d at p. 851.)

The interlocutory judgment of dissolution is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

Tobriner, Acting, C. J., Mosk, J., Clark, J., Richardson, J., Brown (G. A.), J.,* and Devine, J.,† concurred.

---

*Assigned by the Acting Chairman of the Judicial Council.

†Retired Presiding Justice of the Court of Appeal sitting under assignment by the Acting Chairman of the Judicial Council.